**The CHEROKEE NATION OF OKLAHOMA, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

**The CHOCTAW NATION OF OKLAHOMA and The Chickasaw Nation, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

Nos. 95–5055, 95–5056.

United States Court of Appeals, Federal Circuit.

Sept. 5, 1997.

**1414**

James Hamilton, Swidler & Berlin, Chartered, Washington, DC, argued, for plaintiffs-appellants The Cherokee Nation of Oklahoma, The Choctaw Nation of Oklahoma and The Chickasaw Nation. With him on the brief in 95–5055 were Michael L. Spafford and Wilson K. Pipestem. Of counsel on the brief was James G. Wilcoxen, Wilcoxen & Wilcoxen, Muskogee, OK.

Bob Rabon, Rabon, Wolf & Rabon, Hugo, OK, for plaintiffs-appellants The Choctaw Nation of Oklahoma and The Chickasaw Nation.

Thornton W. Field, Attorney, Environment and Natural Resources Division, Department of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief for both 95–5055 and 95–5056 were Lois J. Schiffer, Assistant Attorney General, Edward J. Shawaker and John T. Stahr, Attorneys.

Before MICHEL, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

These cases* test the limit of a trial court's discretion to stay its proceedings. Before the United States Court of Federal Claims, the Cherokee Nation of Oklahoma, the Choctaw Nation of Oklahoma, and the Chickasaw Nation (the Tribes) seek damages from the United States for its alleged failure to manage certain tribal lands. Finding that it could not adjudicate the Tribes' claims until ownership in the tribal lands is conclusively fixed, the trial court indefinitely stayed its proceedings pending the prosecution of quiet title actions in a separate forum. Because the trial court acted without a pressing need to delay the suits and without a proper balancing of the countervailing interests, this court vacates the stay and remands.

**I.**

Between 1830 and 1837, the United States and the Tribes entered into a series of treaties granting the Tribes certain territories in Oklahoma. *See generally Choctaw Nation v. Oklahoma*, 397 U.S. 620, 625–27, 90 S.Ct. 1328, 1331–33, 25 L.Ed.2d 615 (1970). The Act of April 26, 1906, directed that the remainder of those lands should "be held in trust by the United States for the use and benefit of the Indians." Act of April 26, 1906, ch. 1876, § 27, 34 Stat. 137, 148 (1906); *see also Choctaw Nation*, 397 U.S. at 627, 90 S.Ct. at 1332–33. The land at issue in this

---

* Although the Cherokee Nation and the Choctaw and Chickasaw Nations filed separate cases in the United States Court of Federal Claims, the trial court treated them together for purposes of the order at issue here. On appeal, this court continues that unitary treatment of the two separate cases.

case, portions of the Arkansas River riverbed, is tribal territory governed by the 1906 Act. *See Choctaw Nation,* 397 U.S. at 635–36, 90 S.Ct. at 1336–37 (concluding that the United States conveyed riverbed title to the Tribes, thereby resolving a land dispute between the Tribes and Oklahoma). Therefore, the United States is trustee of this territory for the benefit of the Tribes.

The Tribes contend that the United States, as trustee, has misappropriated and mismanaged those lands. Accordingly, on April 21, 1989, the Tribes filed the present actions in the Court of Federal Claims, alleging that the United States breached its fiduciary duties as trustee of the Tribes' interests in the riverbed lands. After being pared down by the trial court, the Tribes' claims amount to allegations that the United States wasted the Tribes' rights in oil, gas, and other minerals by failing to survey the lands, failing to evict trespassers, and generally mismanaging the natural resources. The Tribes also allege unauthorized Government use of their lands in the McClellan–Kerr Arkansas River Navigation System, a federal hydroelectric project with a dredged channel and a series of dams on a portion of the riverbed.

When the trial court issued its stay, the Cherokee Nation's amended complaint stated three counts: (1) breach of duty to manage lands for exploitation of natural gas and oil rights, (2) breach of duty to manage lands for exploitation of solid mineral rights, and (3) breach of duty to protect tribal land from unauthorized Government use. In addition, the Choctaw and Chickasaw Nations state a fourth count for issuing unauthorized rights-of-way on tribal lands.

If the facts ended here, this case would be simpler. But nature has intervened to complicate matters. In the years since 1830, the Arkansas River has meandered and changed courses, thereby obscuring the precise metes and bounds of the Tribes' riverbed lands. Thus, although it is clear that the Tribes own the Arkansas riverbed, the precise boundaries of that riverbed are not settled. As an added complexity, numerous third parties now occupy portions of what may be tribal lands.

On January 28, 1994, the trial court denied the Government's motion for summary judgment on the Tribes' claims. The trial court determined that disputed facts precluded the entry of judgment. Specifically, the trial court believed that it could not address the merits of the suits without knowing the precise metes and bounds of the riverbed lands and the legal rights of third party claimants to those lands. The parties dispute the facts on both of these issues. The trial court concluded: "title to the riverbed land must be resolved before the court can determine which, if any, land owned by the Tribes was mismanaged, not managed, or subject to unauthorized use by the defendant." *Cherokee Nation et al. v. United States,* Nos. 218–89 L and 630–89 L, slip op. at 7–8 (Ct.Fed.Cl. Jan. 28, 1994).

The trial court did not stop there, however. Acting *sua sponte,* the trial court stayed the Tribes' cases indefinitely, pending the outcome of suits to quiet title to the disputed lands. The trial court determined that, although it had the power to quiet title between the United States and the Tribes, it lacked jurisdiction to do so against potential third party claimants. The court reasoned:

> [I]n the interest of justice and judicial economy, title to the Arkansas riverbed must be quieted in district court, which has such jurisdiction, between the Tribes, the government, and any other interested individuals before this court can proceed with the instant action. To avoid a premature decision by the court on the issue of defendant's breach of duty to manage, and relitigation of the action once title to the riverbed is quieted between all affected parties, common sense dictates that this court should suspend plaintiffs' case until such time as plaintiffs have quieted title to the Arkansas riverbed. The court notes for the record that counsel for defendant has informed the court that it is preparing to file the quiet title action in the United States District Court for the Eastern District of Oklahoma.

*Id.* at 8–9.

Again, a further complicating factor intervenes. Although at the time of the trial court's ruling the United States represented to the trial court that it was preparing to file quiet title actions shortly, it has not yet filed

any such suits as of the date of this appeal, more than three years later. Even if all those unspecified suits were underway today, the parties agree that judgment in these actions might be decades away.

## II.

■ The power of a federal trial court to stay its proceedings, even for an indefinite period of time, is beyond question. *See Landis v. North Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936). This power springs from the inherent authority of every court to control the disposition of its cases. *Id.* at 254, 57 S.Ct at 165. When and how to stay proceedings is within the sound discretion of the trial court. *Id.* at 254–55, 57 S.Ct. at 165–66; *see also Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341 (Fed.Cir.1983).

■ The trial court's discretion is not, however, without bounds. *See Hendler v. United States,* 952 F.2d 1364, 1380 (Fed.Cir. 1991). A stay so extensive that it is "immoderate or indefinite" may be an abuse of discretion. *See Landis,* 299 U.S. at 257, 57 S.Ct. at 167 ("The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description."); *Gould,* 705 F.2d at 1341 (inquiring whether a stay is "for such a protracted or indefinite period as to render its issuance an abuse of discretion"); *see also Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541, 545 (5th Cir.1983) (holding that "stay orders will be reversed when they are found to be immoderate or of an indefinite duration" (quoting *McKnight v. Blanchard,* 667 F.2d 477, 479 (5th Cir.1982))). Writing for the Supreme Court in *Landis v. North American Company,* Justice Cardozo instructed that a trial court abuses its discretion by issuing "a stay of indefinite duration in the absence of a pressing need." 299 U.S. at 255, 57 S.Ct. at 166. Ultimately, this standard requires the courts to "weigh competing interests and maintain an even balance." *Id.*

■ In deciding to stay proceedings indefinitely, a trial court must first identify a pressing need for the stay. The court must then balance interests favoring a stay against interests frustrated by the action. Overarching this balancing is the court's paramount obligation to exercise jurisdiction timely in cases properly before it.

## III.

### A.

■ The Court of Federal Claims identified only one reason for its stay—the need to quiet title to the riverbed lands before the case can proceed against the United States. The court opined that its order would avoid duplicative litigation and conserve judicial resources. For several reasons elaborated below, this court concludes that this concern falls short of the "pressing need" required when a trial court seeks to suspend its proceedings indefinitely.

First, the United States is trustee for the Tribes. *See* Act of April 26, 1906, ch. 1876, § 27, 34 Stat. 137, 148 (1906); *see also Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480 (1942) ("Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, [the United States] has charged itself with moral obligations of the highest responsibility and trust [in carrying out its treaty obligations with the Indian tribes]."). This relationship requires, in the first instance, that the United States identify the res with which it is entrusted. *See, e.g., Central States, S.E. & S.W. Areas Pension Fund v. Central Transp., Inc.,* 472 U.S. 559, 572, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447 (1985) (stating that a trustee is "expected to use reasonable diligence to discover the location of the trust property and to take control of it without unnecessary delay" (internal quotations omitted)); *see also* 25 U.S.C. § 176 (1994) ("Whenever it becomes necessary to survey any Indian or other reservations, or any lands, the same shall be surveyed under the direction and control of the Bureau of Land Management...."). According to the Tribes, the United States breached this threshold duty by failing to identify the metes and bounds of the Tribes' lands and to file suits to evict adverse users. Given this allegation, the Tribes could prove

their cases even if the United States never files quiet title actions. In fact, each day the United States does not fulfill its duty to identify and protect the trust res potentially aggravates the alleged breach. Thus, the current cases need not await suits to quiet title.

Further, the Tribes allege that the United States' own land surveys (identified in the parties' submissions as the "Holway report" and a "Bureau of Land Management (BLM) survey") define the United States' trust duties. The Holway report is a river movement study conducted in 1973–1974 by W.R. Holway and Associates under contract to the Bureau of Indian Affairs. The BLM survey is a collection of cadastral surveys of the Arkansas River conducted in 1988–1989 by BLM under Congressional funding for an official river movement study. For these cases, the Tribes stipulate that the BLM surveys "accurately and reliably delineate the boundaries of their Tribal Arkansas Riverbed lands." Likewise, the Government admits that "the BLM, no doubt, is confident of the integrity and accuracy of its survey conclusions."

The United States insists that these surveys will not bind third parties in quiet title actions and, therefore, cannot authoritatively settle the boundaries of tribal land. However, the argument misses the point of the Tribes' suit, which states a claim for breach of fiduciary duties. The trial court need not necessarily adjudicate final rights in the disputed lands to find that the United States breached its fiduciary duties to preserve and manage the Tribes' lands. The surveys, though imperfect, may represent the United States' own definition of its trust duties. Having identified certain Indian lands, the United States allegedly had an affirmative duty to manage those lands for the benefit of the Indians. According to the Tribes, the United States did not fulfill this trust obligation. Judgment on the Tribes' claims need not await a final determination of whether the United States correctly or incorrectly identified the trust res.

Finally, even if this court required settlement of title disputes before permitting the breach of duty claims to proceed, the title disputes over some tribal lands lie within the jurisdiction of the trial court. In particular,

count 3 of each complaint alleges unauthorized use of tribal lands by the United States by virtue of its construction of the McClellan–Kerr Navigation System on tribal lands. With regard to this land, the United States and the Tribes are the only potential claimants. Without a non-party claimant to these count 3 lands, the Court of Federal Claims may, itself, settle the parties' respective rights in the lands. Likewise, count 4 of the Choctaw and Chickasaw Nations' complaint alleges that the United States illegally conveyed rights-of-way, including highways, pipelines, and power lines, over tribal lands. Where the only claimants to the land are the Tribes and third parties occupying easements granted by the United States, the Court of Federal Claims may, incidentally to determining the claims before it, determine the true ownership of the lands.

For these reasons, this court finds no pressing need to await the conclusion of yet-to-be-filed quiet title suits before allowing the Tribes to press their claims against the United States. Eventually, the identification of the exact metes and bounds of the tribal lands and the declaration of rights of third party claimants on those same lands may help determine the quantum of the United States' liability, if any. However, the United States cannot justify a stay of the proceedings on liability merely because a precise determination of the damages is not possible at this moment, particularly when the United States' failure to determine the exact boundaries of the trust lands allegedly contributed to the imprecision in the first place. *Cf. Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."). In sum, this court finds no pressing need to resolve ownership in the disputed lands before adjudicating the Tribes' claims against the United States.

## B.

Against any purported need for a stay, the trial court must weigh the countervailing costs of the stay to the Tribes. Those costs are manifold. First, the trial court's stay seriously impairs the Tribes' access to court. For almost 100 years, the United States has been trustee for the Tribes, but the United States has yet to take any legal action to preserve the Tribes' lands. Since 1970, the United States allegedly has been in various stages of preparing to file quiet title suits on behalf of the Tribes. Yet, it has filed none. Even now, eight years after the Tribes filed this suit, the United States has yet to take such action on behalf of its beneficiary.

Even when filed, the quiet title actions will take years to complete. To stay the Tribes' suit pending these speculative and protracted events is to place the Tribes effectively out of court. *See Hines v. D'Artois,* 531 F.2d 726, 730 (5th Cir.1976) ("Effective death [of a suit] should be understood to comprehend any state of suspended animation."). The trial court's refusal to exercise jurisdiction until completion of the protracted process of quieting title may effectively vitiate the court's "virtually unflagging obligation ... to exercise the jurisdiction given them" to decide controversies. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14–15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)) (recognizing that a trial court may abstain from exercising jurisdiction, whether by dismissal or by delay, only in "exceptional circumstances"). The Tribes, therefore, have a significant interest in avoiding the stay to preserve their access to the court.

The stay also has the cruel effect of placing the Tribes at the mercy of the party against whom they seek redress. Under the trial court's stay, the Tribes cannot pursue their claims against the Government until the Government files and prosecutes the quiet title actions. The potential conflict of interest is manifest. As litigation adversaries go, the United States may be a relatively trustworthy sentry, but this court is confident the Tribes would prefer to have a neutral party guard the "hen house."

Finally, the trial court's decision to postpone resolution of the breach claim impairs the Tribes' ability to plead their causes. With the passage of time, memories will fade, litigation costs will balloon, and resolve will dwindle. These factors will make it difficult for the Tribes to retool for litigation when, and if, their claim is allowed to proceed. For all these reasons, the Tribes have a compelling interest in proceeding with their suit without delay.

## C.

This court must balance the need for the stay against the countervailing interests. As set out above, the protracted and indefinite nature of the trial court's stay will impose heavy burdens on the Tribes, perhaps requiring them to sit idly by, watching their cases wither over the next several decades. Without a pressing need for the stay, this court refuses to impose such an onerous burden on a litigant's right to seek redress against the United States. This court does not say that any diminution in the viability of a party's case, when incidental to a lawfully ordered stay in proceedings, will prevent a trial court from entering such a stay. However, where, as here, the need is so slight and the costs so great, the stay cannot stand.

## IV.

Because quieting title to the Arkansas riverbed lands is not a necessary precursor to resolving whether the United States breached its fiduciary duty to the Tribes, and because the Tribes' interest in pressing forward with the proceedings outweighs the interest of the court in postponing those proceedings, this court finds that the trial court abused its discretion by indefinitely staying its proceedings. The trial court's order is vacated and the causes are remanded.

## COSTS

Each party shall bear its own costs.

*VACATED and REMANDED.*